# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

|  |  |
|---|---|
| MELISSA WILSON; APRIL REYNOLDS; MOHAMMED MOSSA; MAYAN SAID; S.P., by next friend J.P.; K.P., by next friend T.V.; T.V. in her own capacity;  C.A., by next friends D.A.; D.A., in his own capacity; S.V., by next friend M.M.; and S.G., by next friend L.G.;  individually and on behalf of all others similarly situated, | Civil Action No._____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| DARIN GORDON, in his official capacity as the Deputy Commissioner of the Tennessee Department of Finance and Administration and Director of the Bureau of TennCare; LARRY B. MARTIN, in his official capacity as Commissioner of the Tennessee Department of Finance and Administration; and DR. RAQUEL HATTER, Tennessee Commissioner of Human Services, | **FOR DECLARATORY AND INJUNCTIVE RELIEF**  **CLASS ACTION** |
| Defendants. | |

## NATURE OF THE ACTION

1.      This class action challenges Tennessee state policies and practices that delay and deny health coverage to individuals who are eligible for Tennessee's federally funded Medicaid program, known as TennCare.  Through a combination of unlawful policy and administrative dysfunction commencing on and before October 1, 2013, and continuing after the implementation date of provisions of the Patient Protection and Affordable Care Act, Tennessee has created an array of bureaucratic barriers to enrolling in TennCare.  The State's acts and

1

omissions deprive thousands of low-income Tennesseans of all ages timely access to essential medical care for which they are eligible under state and federal law.

2.      Tennessee has known for months that it is violating federal law.  For example, since January 1, 2014, it no longer has a system that allows an individual to apply directly to TennCare through the State or submit an application in person, as is required by federal law. The State has required all Tennesseans who wish to apply for TennCare coverage to do so through the federal Marketplace, even though it knows that the federal Marketplace was not intended to serve this function and does not fully process all categories of Medicaid eligibility. Unlike every other state, Tennessee has closed the state TennCare application process to its citizens, does not have an operating system that will process applications, and bars the door to citizens seeking an eligibility decision from the state, as is their right.

3.      Defendants' policies and practices violate federal Medicaid requirements that all individuals wishing to make an application for medical assistance "shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C.  § 1396a(a)(8).

4.      Defendants' policies and practices violate the federal Medicaid requirement to "grant[] an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).  The Defendants' refusal to afford applicants a hearing further deprives the Plaintiffs of their right to Due Process of Law in violation of the Fourteenth Amendment to the United States Constitution.

2

5. Plaintiffs seek declaratory and injunctive relief for themselves and the class members whom they represent to ensure that Defendants will provide timely access to medical assistance, as required by law, and will provide a hearing when there are delays.

## JURISDICTION AND VENUE

6. Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which provides for original jurisdiction over all civil suits involving questions of federal law, and 28 U.S.C. § 1343(3) and (4), which grant this Court original jurisdiction in all actions authorized by 42 U.S.C. § 1983 to redress the deprivation under color of State law of any rights, privileges, or immunities guaranteed by the U.S. Constitution and Acts of Congress.

7. Plaintiffs seek declaratory, injunctive and other appropriate relief, pursuant to 28 U.S.C. §§ 2201 and 2202; Fed. R. Civ. P. 23, 57, and 65; and 42 U.S.C. § 1983.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

### Plaintiffs

9. Melissa Wilson is an adult resident of Cookeville, Putnam County, Tennessee.

10. April Reynolds is an adult resident of Lafayette, Macon County, Tennessee.

11. Mohammed Mossa is an adult resident of Antioch, Davidson County, Tennessee.

12. Mayan Said is an adult resident of Antioch, Davidson County, Tennessee.

13. S.P. is a minor resident of Pigeon Forge, Sevier County, Tennessee. She brings this action by her father and next friend, J.P.

14. K.P. is a minor resident of Soddy Daisy, Hamilton County, Tennessee. He brings this action by his mother and next friend, T.V.

3

15.     T.V. is an adult resident of Soddy Daisy, Hamilton County, Tennessee.  She brings this action as next friend of K.P., and also in her own capacity.

16.     C.A. is a minor resident of Nashville, Davidson County, Tennessee.  He brings this action by his father and next friend D.A.

17.     D.A. is an adult resident of Nashville, Davidson County, Tennessee.  He brings this action as next of friend of C.A. and also in his own capacity.

18.     S.V. is a minor resident of Nashville, Davidson County, Tennessee.  He brings this action by his mother and next friend, M.M.

19.     S.G. is a minor resident of Madison, Davidson County, Tennessee.  He brings this action by his father and next friend, L.G.

<u>Defendants</u>

20.     Defendant Darin Gordon is sued in his official capacities as Deputy Commissioner of the Tennessee Department of Finance and Administration (DFA) and is the Director of that Department's Division of Health Care Finance and Administration (HCFA). Deputy Commissioner Gordon oversees all of the health-care related divisions within the DFA, including the Bureau of TennCare (the "Bureau").

21.     Defendant Larry B. Martin is sued in his official capacity as the Commissioner of the Tennessee DFA, of which HCFA and the Bureau are subordinate agencies.  DFA is Tennessee's "single state agency," within the meaning of 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10, that is responsible for administering the TennCare program.[1]  The Bureau is the division of DFA that directly manages TennCare.

_____

[1] DFA is also charged with administration of Tennessee's Children's Health Insurance Program, called CoverKids.  T.C.A. §§ 71-3-1102, 71-3-1104.

4

22.     Defendant Dr. Raquel Hatter is sued in her official capacity as the Commissioner of the Tennessee Department of Human Services (DHS).  Under her supervision, DHS performs some TennCare eligibility and enrollment functions.

## FACTUAL ALLEGATIONS

### Overview of the Medicaid Program

23.     Title XIX of the Social Security Act, known as the Medicaid Act, provides medical assistance to certain individuals who cannot afford to pay for needed health care.  42 U.S.C. § 1396.  Medicaid is administered at the federal level by the Centers for Medicare & Medicaid Services (CMS) of the Department of Health and Human Services (HHS).  Each state decides whether to participate in the Medicaid program, and all fifty states do.

24.     The state and federal governments share responsibility for funding and administering Medicaid.  States must administer the program subject to federal requirements imposed by the Medicaid Act, as well as by CMS regulations and policy directives.  If a state opts to participate in the program and accept federal funding for its operation, the state must submit to CMS a "State Plan" describing its program in detail and containing the state's commitment to comply with the conditions and requirements imposed by the Medicaid Act and related regulations.  The federal Secretary of HHS must approve the State Plan.

25.     Tennessee has participated in Medicaid continuously since 1968.

26.     Federal Medicaid funds approximately 65 % of the services provided to TennCare beneficiaries, while Tennessee provides the remaining 35 %.  Federal funding is uncapped, in that CMS matches without limit at the 65% rate all lawful Medicaid costs incurred by Tennessee.

27.     Each state must designate a "single state agency" to administer the program consistent with federal law.  42 U.S.C. § 1396a(a)(5).  By executive order dated October 19,

1999, the Department of Finance and Administration (DFA) became the designated single state agency in Tennessee.

28.     In 1993, Tennessee obtained from the Secretary of HHS a Medicaid demonstration waiver under Section 1115 of the Social Security Act, 42 U.S.C. § 1315.  The waiver permitted the State to replace its conventional Medicaid program with a demonstration program called TennCare.  The five-year waiver was implemented in January 1994 and has been periodically revised and renewed since then pursuant to 42 USC § 1396n.  The TennCare waiver was last renewed in July 2013 for a three-year period.

29.     The federal waiver exempts the demonstration program from compliance with only a few specified federal Medicaid statutes and rules.  All laws and rules not explicitly waived remain fully applicable to TennCare.  The Defendants have neither sought nor received a waiver of any of the federal laws or regulations that are relevant to this case.

30.     For over 40 years, until January 1, 2014, the TennCare Bureau contracted with DHS to administer the eligibility process.  Most individuals who were eligible for TennCare coverage applied in person at local DHS offices, which are located in all 95 counties of Tennessee.  Applicants were interviewed by social workers who took their information and keyed it into a DHS computer system known by the acronym "ACCENT."  This enabled people who had limited literacy or computer skills to successfully apply.  DHS eligibility workers were also able to directly access the eligibility system and resolve problems on the applicant's behalf.  DHS also provided accommodation to individuals who, because of disabilities, were unable to otherwise navigate the application process.

31.     In addition to accepting and processing TennCare applications in-person in every county, DHS operated a call center, known as the Family Assistance Service Center, that

accepted calls from TennCare applicants and enrollees seeking help with their eligibility. The Center's staff could access a caller's applications and eligibility files and resolve problems affecting his or her TennCare eligibility.

32.     To enroll in Medicaid, individuals have traditionally been required to meet specified eligibility criteria. First, they must meet so-called "categorical eligibility" rules by showing that they are aged, blind, disabled or pregnant, or that they are children or parents of dependent children. Second, they must show that their income is below certain limits, which vary depending on the categorical eligibility group to which they belong. Finally, individuals in some, but not all, categorical eligibility groups would have to meet additional limits on the amount of resources, or assets, they own.

33.     Individuals receiving Medicaid coverage are subject to renewal and reverification of eligibility every 12 months. 42 C.F.R. § 435.916.

34.     Federal law requires that the state plan "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Determinations of eligibility for Medicaid must be made within 45 days after the application was submitted or within 90 days if eligibility is based on a disability, 42 C.F.R. § 435.912(c)(3), and State plans must "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures." *Id.* § 435.930(a).

35.     Newborns born to mothers receiving TennCare are subject to special rules regarding application for and receipt of benefits. Under federal law, "[a] child born to a woman eligible for and receiving medical assistance under a State plan on the date of the child's birth shall be deemed to have applied for medical assistance and to have been found eligible for such

assistance under such plan on the date of such birth and to remain eligible for such assistance for a period of one year." 42 U.S.C. § 1396a(e)(4).

36.     A state may also cover unborn children through the Children's Health Insurance Program (CHIP), which covers many otherwise-uninsured children in the United States. Balanced Budget Act of 1997, Pub. L. No. 105-33, §§ 2101-2110 (Aug. 5, 1997), *codified at* 42 U.S.C. §§ 1397aa to 1397jj; 42 C.F.R. § 457.10.

37.     Tennessee has opted to extend the CoverKids coverage to unborn children whose pregnant mothers meet the income limitations specified by the State and who are not otherwise eligible for Medicaid.  The State Plan provides that an unborn child's eligibility is to be redetermined at birth, but a child is not eligible for CHIP if he or she is eligible for TennCare. *See* Tenn. State Child Health Plan §§ 4.1.8; 4.3.

38.     The CHIP statute requires that the State establish procedures such that children found through screening to be eligible for Medicaid should be enrolled in that program.  42 U.S.C. § 1397bb(b)(3)(B).

39.     States must provide for granting an opportunity to be heard to any individual whose application is not acted on with reasonable promptness.  42 U.S.C. § 1396a(a)(3). Constitutional due process protections also require notice and an opportunity to be heard. U.S. Const. amend. XIV; *Goldberg v. Kelly*, 397 U.S. 254 (1970).

40.     The duties to adjudicate applications with reasonable promptness, and to provide a hearing for any individuals whose applications are not acted upon with reasonable promptness, are nondelegable.  42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.10(c)(3); 435.1200(b).

<u>Overview of the Affordable Care Act Reforms</u>

*The ACA's Extension of Health Coverage to the Uninsured*

8

41.     The Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), P.L. 111-148, was enacted by Congress in March 2010. "The Act aims to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed. Of Ind. Bus. v. Sebelius*, 132 S. Ct. 2566, 2580 (2012). Implementation of the law occurred in phases, culminating on January 1, 2014, when major new health insurance coverage provisions took effect.

42.     The ACA establishes a sliding scale of premium tax credits, adjusted by household income, to subsidize the cost of commercial health coverage for uninsured households with incomes between 100% and 400% of the federal poverty level. The ACA also provides cost sharing reductions for uninsured households with incomes between 100% and 250% of the federal poverty level. An individual can qualify for a premium tax credit only if she is *not* receiving coverage through Medicaid or CHIP.

43.     The ACA also expands Medicaid coverage to non-disabled, non-elderly, non-pregnant individuals with income below roughly 138% of the federal poverty level.

44.     The ACA provides for the federal government to pay 100% of the cost of the new coverage during 2014 – 2016 and at rates of not less than 90% thereafter.

45.     The Supreme Court upheld the Medicaid expansion provision but decided that it was unduly coercive to require states to expand by threatening to terminate their federal funding. The remedy was to deny the Secretary of HHS the ability to deny federal funding to a non-expanding state, thus effectively making the expansion optional. *Nat'l Fed. of Ind. Bus.*, 132 S. Ct. at 2607.

46.     To date, Tennessee has refused to expand Medicaid coverage to non-disabled, non-elderly, non-pregnant individuals described in the ACA. Though Plaintiffs are eligible for

TennCare without the expansion, Tennessee's decisions related to the ACA and the related bureaucratic delays adversely affect the Plaintiffs, as explained below.

*The ACA's Change in the Calculation of Medicaid Eligibility*

47.     The ACA instituted multiple reforms to simplify and streamline the application, eligibility and enrollment process for publicly subsidized health coverage.  As explained above, Medicaid income eligibility requirements have historically varied by state and by category within a state.  Different rules have defined what income to count, which people to include in the household, and what deductions to make.  The ACA sought to simplify and standardize the methodology for calculating income eligibility for most applicants and recipients.  The ACA made the calculation of income for Medicaid purposes generally compatible with the rules used to calculate premium tax credit eligibility.

48.     The new methodology for counting income adapts longstanding Internal Revenue Service rules and is known as "Modified Adjusted Gross Income," or MAGI, calculation.  MAGI is used to calculate income eligibility for children, pregnant women and parents of dependent children, groups which together account for approximately 80% of all TennCare enrollees.  These groups are referred to as the "MAGI categories."  The ACA also requires that states use MAGI methodology to determine eligibility for their CHIP.

49.     MAGI methodology does not apply to those Medicaid categories that are based on age, blindness or disability.  Tennessee thus must to continue to screen applicants for eligibility for those categories, referred to as the "non-MAGI categories," employing pre-ACA methodologies that are not related to MAGI.

50.     The ACA requires states to authorize hospitals to make "presumptive eligibility" determinations and enroll individuals in Medicaid whom the hospitals determine are likely to be

eligible as pregnant women, children, patients with breast or cervical cancer, or persons seeking family planning services that meet specified income requirements. This allows coverage to begin immediately while the individual's application for Medicaid coverage is submitted to the state agency and their eligibility determined. Households found to be presumptively eligible have full Medicaid coverage for a period of at least a month or, at state option, up to a full year, or until disposition of their application for regular Medicaid. To date, Tennessee has not implemented hospital presumptive eligibility.

*The ACA's Streamlined Application Process*

51.     Until the ACA took effect, applicants in most states, including Tennessee, have had to submit separate applications for Medicaid and CHIP coverage. The ACA requires the simplification and integration of the application process. Two principles are central to the ACA's application reforms:

        a       A state can only require a "single streamlined application" in order for an applicant to be considered for multiple programs providing subsidized health coverage; and

        b       There is "no wrong door," meaning that a state must process the application if it is submitted through any of a number of portals, and by any of several means.

52.     CMS developed and instituted a "single streamlined application" that collects information needed to determine an applicant's eligibility for Medicaid, CHIP or a premium tax credit, and to enable the applicant to enroll in the program for which she is found eligible. A state may develop and use its own single, streamlined form if it is consistent with the standards set by the Secretary. 42 U.S.C. 18083(b).

53.     A state may not request information that is already accessible through existing government databases (such as documentation of wages or Social Security income) or that is not

essential to determining eligibility. A state also may not request information beyond that requested in the "single, streamlined application" unless the applicant seeks a determination of eligibility for a non-MAGI category of coverage, such as eligibility based on old age or disability. 42 U.S.C. § 18083(b)(1); 42 C.F.R. §435.907(b), § 435.952(c).

54. The ACA requires that states accept "single streamlined applications" for Medicaid and CHIP coverage, and for premium tax credits, in person, by phone, by mail or online. The states may not require the submission of applications to multiple sites, or by multiple means, in order to consider applicants for all types of subsidized coverage.

*The ACA's Establishment of an Insurance Exchange or "Marketplace"*

55. The ACA authorizes the establishment in each state of an online insurance exchange where individuals can apply for and purchase publicly subsidized health insurance coverage. The ACA affords each state the option to establish its own exchange or to authorize the federal government to operate the exchange for the state's residents. Regardless of the option selected, the ACA requires States to develop a system allowing for an exchange of data and a determination of eligibility. 42 U.S.C. § 18083(c).

56. In December 2012, Tennessee officials announced that they would not operate a state exchange, thus delegating operation of Tennessee's exchange to a federal agency within HHS. By operation of the ACA, the federally facilitated exchange (FFE), also known as the federally facilitated marketplace (FFM) or simply "the Marketplace," began operation October 1, 2013.

<u>The Role of the FFM in Determining TennCare Eligibility</u>

57. The fundamental purpose of a health insurance exchange is to provide a structured marketplace for the sale and purchase of health insurance. To fulfill this purpose, the

12

Marketplace may determine an applicant's eligibility for each type of insurance affordability program, including Medicaid, CHIP, premium tax credits, and cost-sharing reductions.

58. Because Tennessee has not expanded Medicaid, the FFM must refer applicants potentially eligible for Medicaid who do not fall into a MAGI eligibility category to the state agency for an evaluation of their eligibility in any of several non-MAGI categories (most of which are based on disability or old age).

59. States can reach agreements with the FFM regarding determinations of Medicaid eligibility that fall into two categories:

a      The FFM can assess applicants for Medicaid eligibility under MAGI rules, and transfer any applicants who appear eligible for the state's independent determination of the applicant's Medicaid eligibility. The state's determination trumps any FFM assessment that is inconsistent with the state's decision. States that elect this option are referred to as "assessment states" because the FFM only "assesses" MAGI eligibility for the limited purpose of evaluating eligibility for premium tax credits, and those assessments are subject to being superseded by a subsequent state determination of Medicaid eligibility.

b      Alternatively, a state can contract with the FFM to act as the state's agent and make determinations of Medicaid eligibility on the state's behalf for any applications submitted through the FFM. States that choose this option are called "determination states" because the FFM evaluation of Medicaid eligibility acts as the actual determination of the applicant's Medicaid status in a MAGI category. Nevertheless, if a determination state makes its own determination of eligibility on a particular application, the FFM must honor that decision. *See* 45 C.F.R. §§ 155.302(b)(5); 155.345(h); Fair Hearings and Appeal Processes, 78 Fed. Reg. 42160, 42167–68 (July 15, 2013).

60. Tennessee elected to be a "determination state." Bureau of TennCare, Mitigation Planning for January 1, 2014 (updated July 14, 2014) ¶ 2.[2]

61. As a determination state, the Tennessee single state Medicaid agency remains responsible ensuring that applicants' eligibility for non-MAGI categories of coverage are determined with reasonable promptness. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(c)(3), § 435.1200(b)(3)(iii) and § 435.1200(c)(2).

62. As a determination state, the Tennessee single state Medicaid agency also remains responsible for ensuring that all eligibility determinations, including those delegated to the FFM, comply with applicable laws and regulations. *Id.*

63. Federal law requires Medicaid eligibility determinations to be made with "reasonable promptness," within 45 days of applying or, in the case of an individual applying on the basis of disability, 90 days. *See* 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.911(a).

64. Federal law requires the single state agency to ensure an opportunity for a hearing to all individuals whose claims for assistance are denied or not acted on with reasonable promptness. 42 USC 1396a(a)(3); U.S. Const. amend. XIV.

<u>Tennessee's Systemic Failure and Refusal to Implement the ACA</u>

*The State's Missed Compliance Deadlines and Mitigation Plan*

65. The calculations required to implement the ACA's coverage and enrollment provisions require new information technology (IT) systems or reprograming of existing systems. The ACA provided states 90% of the funds needed to be able to meet the new IT system requirements by October 1, 2013. Utilizing this federal funding, Tennessee entered into a $35.7 million contract for the development of a new IT system known as the TennCare

---

[2] *Available at* http://s3.documentcloud.org/documents/1217649/cms-response-letter-7-14-14.pdf.

Eligibility Determination System, or TEDS, in December 2012. TEDS was to have been operational by October 1, 2013.

66. TEDS has been plagued by numerous setbacks and delays. In June 2013, Defendant Gordon reported to CMS that TEDS would not be ready by the October 1, 2013 deadline. To date, TEDS continues to be inoperable.

67. During a June 26, 2013, consultation with State officials, CMS discussed with the State their plan for completing and implementing the IT system. On August 16, 2013, CMS sent a letter to Defendant Gordon a list of planning items that were still missing, including identification and prioritization of performance measurements (including IT functionality and regulatory compliance), training to support the eligibility system, a description of the process and procedures for staff to follow, processes for securing personally identifiable information, and a strategy for managing data during and after execution of the TEDS project. The list of missing or incomplete items filled six pages.

68. CMS also required the Defendants to submit a Mitigation Plan to minimize adverse impact on applicants and enrollees. The Defendants provided in the Mitigation Plan that, between October 1 and December 31, 2013, the State would authorize the federal Marketplace to determine MAGI eligibility for the State; the State would accept the federal Marketplace's determination of MAGI eligibility; and that the State would accept the federal Marketplace's transfer of accounts containing applicants' applications and related information.

69. The State's Mitigation Plan provided additional assurances to CMS, including that:

a TEDS would be operational and that all procedures would be in place and the State would meet all of its compliance obligations by January 1, 2014. The Plan stated that,

15

as of January 1, 2014, the State would reassume exclusive responsibility for all aspects of Medicaid eligibility;

    b  The State would send notices to applicants when it received their accounts from the federal Marketplace; and

    c  The State would accept the federal Marketplace's determination of applicants' eligibility, enrolling in TennCare all individuals whom the federal Marketplace found to be eligible.

   70.  The Defendants did not fulfill any of these assurances or conditions.

<em>The Defendants Close the State "Door" to Most TennCare Applications</em>

   71.  The Defendants closed the State's TennCare application portals.  In September 2013, on instructions of Defendant Gordon, Defendant Hatter sent a bulletin to all county DHS offices informing them that, beginning in January 2014, DHS would no longer accept or process TennCare applications.

   72.  Twenty-six other states rely on the federal Marketplace, and at least eleven of those states are, like Tennessee, determination states that have authorized the Marketplace to determine MAGI eligibility of Medicaid applicants.  Each of these states (except for Tennessee) continues to make Medicaid eligibility determinations for MAGI and non-MAGI applications..  Tennessee is the only state that has closed its own doors to Medicaid applications and made the federal Marketplace the exclusive portal through which its residents apply for Medicaid coverage.

   73.  When the federal Marketplace began operations on October 1, 2013, individuals attempting to apply for Medicaid or other subsidized coverage encountered pervasive systemic barriers.  Many individuals who succeeded in submitting applications to the Marketplace online

16

or by phone during its initial months of operation later learned that there was no record of their having applied.  Marketplace operations improved steadily after November 2013, but some applicants have continued to encounter problems.

74.     Problems with the federal Marketplace received widespread, persistent coverage in the news media nationally and in Tennessee.  While other determination states encouraged individuals to apply directly to the State, Tennessee officials insisted that all TennCare applicants apply through the Marketplace.

75.     On the TennCare website, the Defendants posted a notice in December 2013 that remains on the site at http://www.tn.gov/tenncare/forms/DoYouNeedHelp.pdf.  The notice informs the public that:

> **Starting January 1st**, you must apply for TennCare through the Health Insurance Marketplace.  You can apply online at www.healthcare.gov.  Or you can call them at **1-800-318-2596**.  After the Health Insurance Marketplace reviews your application, they'll tell us if you are eligible for TennCare.
>
> **You can't apply for TennCare Medicaid anymore at your local Department of Human Services (DHS) office.**  But, if you need to use a computer to apply for TennCare Medicaid through the Health Insurance Marketplace, your local DHS office will have one you can use.

(boldface in the original).

76.     Defendant Gordon also posted the following statement, which remains on the TennCare Bureau website at http://www.tn.gov/tenncare/mem-apply.shtml:

> How to Apply
>
> You must apply for TennCare through the Health Insurance Marketplace.  Apply online at www.healthcare.gov.
>
> Paper applications are available at here.
>
> Or you can call them at **1-800-318-2596**.  They can mail an application to you or help you apply online.

If you do not have a computer and/or internet access you can apply at a kiosk at your local DHS office. Click here for DHS locations.

77.     On January 1, 2014, at the same time the Defendants stopped accepting TennCare applications through DHS, they also eliminated the ability of applicants to get help through the DHS call center, known as the Family Assistance Service Center.

78.     The Defendants have not replaced the call center capacity.  In approximately January 2014, TennCare entered a 4-year, $31 million contract with Cognasante, LLC to operate a call center to be known as Tennessee Health Connection.  Defendants have created the Tennessee Health Connection to be the only State agent authorized to field calls and answer inquiries about TennCare from applicants or others.  The number for the Tennessee Health Connection is published on the standard notice issued by the FFM with any preliminary or final eligibility determinations, which states:

> If the table above tells you that you or any of your family members are or may be eligible for TennCare or CoverKids, the state agency will contact you with more information about your health benefits, services and how much you pay for them. If you don't hear from them, call them at the phone number listed in the section, "Where can I find more information?"
> . . .
> For more information about TennCare, contact the TennCare at Toll-Free:1-855-259-0701 (TTY:1-800-848-0298).

79.     Tennessee Health Connection began accepting calls in January 2014. Defendants' lack of training and preparation left Tennessee Health Connection staff ill-equipped to assist TennCare applicants, beyond referring them to the FFM website, www.healthcare.gov. In contrast to the broad responsibilities and powers of the former DHS call center and DHS office employees, Defendants gave the Tennessee Health Connection only limited abilities to access an applicant's file, and did not enable Tennessee Health Connection employees to resolve most problems affecting applicants' eligibility.

18

80.     The Defendants have been aware since they began posting notices last year referring TennCare applicants to the FFM that the notices relegate eligible Tennesseans to an application process that in many instances is not functional, and that in any event was never designed to determine eligibility for non-MAGI TennCare categories.

81.     Since January 2014, the FFM has notified tens of thousands of Tennessee applicants that they are, or may be, eligible for TennCare, and that the state agency will contact them with more information.  Thousands have never been contacted and have never received TennCare.  Many thousands of others who are eligible in non-MAGI categories, and who have been referred to the TennCare Bureau for determination of such eligibility remain without a decision after delays of more than 45 days and, in many cases, even 90 days.

82.     Some of these individuals are newborns who received coverage through CoverKids prior to birth and who were supposed to receive a redetermination of eligibility upon birth.  Despite the fact that Tennessee has access to their eligibility information and should have completed a MAGI calculation to determine eligibility for CoverKids and TennCare, CoverKids does not have procedures to ensure enrollment in TennCare, in violation of federal law.  42 U.S.C. § 1397bb(b)(3)(B).  Tennessee instead directs these newborns to apply through the FFM.

83.     TennCare discontinued granting any opportunity for a fair hearing within the State agency for an applicant to challenge the refusal of TennCare to act on the applicant's application with reasonable promptness, as required by the Medicaid Act.

84.     The inability of the TennCare Bureau to timely and accurately process TennCare eligibility has prompted the Defendants to rely partially on DHS to perform some "back office" eligibility functions, although DHS is still barred from accepting applications directly from applicants.

19

85.     Defendants continue to use outdated form notices that reflect pre-January 1, 2014 eligibility rules and refer people to DHS, and therefore mislead applicants about their rights to receive medical assistance and how to do so.

*The Defendants' Handling of TennCare CHOICES and MSP Applications*

86.     When the Defendants stopped accepting applications directly from TennCare applicants, it carved out exceptions for two special TennCare programs, CHOICES and the Medicare Savings Program (MSP).   CHOICES provides nursing home care and home and community-based services for the elderly and adults with disabilities.

87.     As has been the case for several years, applicants for CHOICES submit their applications through an area agency on aging and disability.  Since January 1, 2014, TennCare has misled would-be applicants about how and where to apply.  The TennCare website states:

> Do you want to apply for CHOICES (TennCare CHOICES in Long-Term Care)? If you don't already have TennCare, the Tennessee Health Connection can help you apply for CHOICES.

Tennessee Health Connection personnel do not assist with CHOICES applications. These personnel often do not refer callers to their local area agency on aging and disability but rather to the FFM.

88.     On January 1, 2014, DHS transferred the responsibility for determining financial eligibility for CHOICES to the TennCare Bureau.  Since then, applications have become backlogged and have routinely exceeded 90 days without a decision.

89.     The other exception to the general State policy requiring that all TennCare applications be submitted to the FFM applies to TennCare's Medicare Savings Programs (MSP). Medicare Savings Programs are designed to make Medicare more affordable for poor and near-poor Medicare beneficiaries by providing for Medicaid to pay premiums and eliminating out-of-

20

pocket cost sharing.  The MSP consists of the Qualified Medicare Beneficiary (QMB), Special

Low Income Medicare Beneficiary (SLMB) and Q1 programs.

90.     On January 1, 2014, the TennCare Bureau also took over the determination of

eligibility for MSP from DHS.  Since then, MSP applications have been backlogged and

routinely exceed 45 days without a decision.

*CMS Cites Continued Failings by TennCare*

91.     Since October 2013, CMS has expressed concerns about the State's continued

delays.  In a June 27, 2014 letter to Defendant Gordon, CMS noted that the state "has repeatedly

expressed reluctance to deploy resources toward adopting mitigation solutions for in-state

applications."   *See* Letter from Cindy Mann, CMS, to Darin Gordon, TennCare (June 27, 2014).

Instead of creating these solutions, in January 2014, the State eliminated hundreds of DHS

positions that had been used to accept and process TennCare applications.  In June 2014, the

State made that change irrevocable by laying off over a hundred DHS workers statewide who

could have been used to accept applications and assist applicants.

92.     The letter highlighted that TennCare still lacks many of the identified "critical

success factors" of ACA implementation.  It also emphasized that CMS's "approval to leverage

the FFM to receive and process applications on the state's behalf was approved as a short-term

measure, not a long-term solution."  CMS outlined possible solutions, noting that it had already

offered Tennessee options such as "manual MAGI processing (with tools that can facilitate this

processing that can be readily adapted for Tennessee) and hiring additional staff to assist with

application processing (for which enhanced Medicaid matching funds may be available)."  CMS

emphasized that "implementation of a hospital presumptive eligibility program, which was also

required for January 1, 2014, but is not yet implemented in Tennessee," could dramatically

improve many of the problems Tennesseans are facing, because this would provide a streamlined method for individuals to get immediate coverage while their applications were being adjudicated.

*The Defendants' Continued Intransigence*

93.     On July 14, 2014, Defendant Gordon responded to CMS that he was aware that a "small percentage" of the more than 125,000 applicants had been having difficulty obtaining coverage but claimed Tennessee was actually performing better than other states because Tennessee did not have "backlogged applications."  He did not acknowledge that Tennessee has refused to process <u>any</u> applications, so it has no backlogs or completed logs.

94.     Defendant Gordon informed CMS that the State would continue attempting to implement TEDS and in the interim would refer everyone to the FFM.  He provided no update on when TEDS would be ready, noting only that the State was hiring a consulting company to provide a third-party perspective on progress to date.

95.     The Defendants have made the FFM their exclusive agent for determining eligibility for almost all categories of TennCare, but they knowingly and consistently refuse to accept responsibility for delays or errors by the FFM or for the State's delays and errors in implementing the FFM's determinations.  The Defendants also refuse to accept responsibility for delays and systemic failures in the processing of applications for CHOICES or MSP eligibility.

96.     Defendants' knowing and willful policies and practices as described above have been depriving, and continue to systematically deprive, thousands of applicants of an opportunity to apply for medical assistance and obtain an accurate determination of their eligibility within a reasonable time.

<u>Injuries to the Named Plaintiffs</u>

22

*Plaintiff Melissa Wilson*

97.     Melissa Wilson is an adult resident of Cookeville, Putnam County, Tennessee, who cares for and lives with her three minor grandchildren.  Ms. Wilson suffers from renal kidney failure, lupus, high blood pressure, osteoporosis, and needs regular blood fusions.  She does all she can to make ends meet, including working about 32 hours a week, but her typical monthly household income is only about $1100. Ms. Wilson is uninsured.

98.     Doctors have advised Ms. Wilson that she should regularly see three specialists as well as a primary care doctor. She cannot afford to do so.  Instead, she relies on a community health clinic which provides some, but not all of the care, she requires.  Ms. Wilson's doctors have prescribed her seventeen prescriptions but she is only able to purchase three of these at a cost of hundreds of dollars.  Ms. Wilson's health is failing, and she needs medical coverage through TennCare.

99.     Ms. Wilson applied for TennCare through the Federal Marketplace on about February 10, 2014, while she was in the hospital for a blood transfusion.  She has not received any response on her application.

100.     Ms. Wilson turned to the Tennessee Health Connection for help after being directed to them by the FFM for more information about her application.  She most recently called Tennessee Heath Connection the week of July 14 and was told again that her application is in limbo.  She asked if she could have a hearing regarding the application and the delay and was told that they do not do those hearings.

*Plaintiff April Reynolds*

101.     April Reynolds lives with her husband and three children in Lafayette, Tennessee. The family survives on approximately $1,374 a month from Social Security Disability Insurance,

the Supplemental Nutrition Assistance Program, and social security benefits for the children. Ms. Reynolds and her husband are unable to work, and they are not able to pay for Ms. Reynolds' medical needs.

102.    In March 2014, Ms. Reynolds suffered a high blood pressure episode that nearly resulted in a heart attack.  She was hospitalized in critical condition for three days.  The doctor informed Ms. Reynolds that if she had waited any longer she may have died. She delayed checking into the hospital because she has no health insurance.  Ms. Reynolds incurred over $20,000 in hospital bills from this incident.  She has been unable to pay these debts and worries about what will happen if she has another medical emergency.  Ms. Reynolds is supposed to go to the doctor at least once a month to check on her blood pressure and heart, but has only been to the doctor once since March 2014 because she does not have health insurance and cannot afford it.

103.    Ms. Reynolds applied for TennCare coverage through the Federal Marketplace on about February 19, 2014.  The Marketplace reported that she may be Medicaid eligible but requested proof of income.  Ms. Reynolds submitted the income information that day.

104.    Ms. Reynolds and her husband have called the Tennessee Health Connection several times in March, April, and May inquiring about the status of her application.  During these calls she was routinely told to wait 45 to 60 days for an eligibility determination.  On some phone calls, she was told she would receive a document in the mail, but she has not received anything from TennCare or the Tennessee Health Connection.  Finally, in June Ms. Reynolds resubmitted a complete application for benefits through the FFM website.

105.    Ms. Reynolds most recently called Tennessee Heath Connection the week of July 14, and was told that they were unaware of the current status of her application.  She asked if she

could have a hearing regarding the application and the delay, and was told there was no way she could appeal without a determination of her eligibility.

*Plaintiffs Mohammed Mossa and Mayan Said*

106.     Mohammed Mossa and Mayan Said are married and live with their five minor children in Antioch, Tennessee.  The family survives on approximately $2,000 a month from Social Security Disability and Dependent benefits and the Supplemental Nutrition Assistance Program.  Mr. Mossa and his wife are unable to work, and they are not able to pay for Mr. Mossa's critical medical needs.

107.     Mr. Mossa was diagnosed with leukemia in around December 2011 and also suffers from a debilitating back injury.  He requires extensive and on-going medical treatment and has undergone two rounds of chemotherapy.

108.     Mr. Mossa's wife, Mayan Said, suffers from diabetes, anemia, high blood pressure, and kidney stones, requiring ongoing clinical treatment.

109.     The medical bills of the Mossas are substantial.  Mr. Mossa's prescription drugs often cost over $2,000 per month, and Mayan's clinical visits typically cost $45 per visit.  Mr. Mossa now receives Medicare, but even with these benefits the family is unable to cover their medical expenses for their necessary on-going treatment.  Mr. Mossa applied for TennCare for himself and his wife through the Federal Marketplace on about February 18, 2014, over the phone.  He was told to wait about a month to hear back about the application, and was then told that his application had been forwarded to TennCare.

110.     Mr. Mossa has contacted the Tennessee Health Connection at least three times since applying in February.  Each time he was told that he and his wife were not in their system,

and often they were told that they would receive a determination within ten days. They still have not received an eligibility determination.

111. Mr. Mossa most recently called Tennessee Heath Connection the week of July 14, and was told again that a determination on their application had not been made. He asked if he could have a hearing regarding the application and the delay, and was told that they do not do hearings on cases like this.

*Plaintiff S.P.*

112. S.P. was born in late January 2014. She lives with her parents in Pigeon Forge, Tennessee. The family of three earns approximately $1,600 per month in income, which is not enough to cover all of the family's needs, particularly S.P.'s medical care.

113. S.P. was covered as an unborn child under CoverKids beginning in October 2013. Her mother received health coverage through CoverKids until the end of June. CoverKids did not provide S.P. with any medical assistance after her birth. S.P. and her family are currently uninsured.

114. In May, S.P. became critically ill, having a very high fever that caused her entire body to shake. She was taken to the emergency room, and doctors discovered that she had a severe bacterial infection, with e-coli present in her blood. S.P. received intensive care over the next four days, including a spinal tap, CT scan and extensive testing. The family received bills totaling over $17,000. The family cannot afford to pay these bills.

115. Shortly after S.P.'s birth, on approximately February 5, her father J.P. applied for TennCare coverage by calling the Federal Marketplace. J.P. was initially told that the family members were all potentially eligible for TennCare, but the representative requested identity

verification documents, which J.P. promptly mailed in.  However, they heard nothing after submitting the information.

116.    During the time of S.P.'s hospitalization in May, J.P. contacted Tennessee Health Connection to inquire about the status of S.P.'s application. He was told that they had no record of the documents that he submitted to the FFM.  J.P. resubmitted this information to the FFM on approximately May 10, 2014.  When he called again later in May, he was told that the documents had not been received, so he resubmitted them another time.  On June 6, 2014, J.P. received a letter that confirmed that the identification documents submitted in February had been received, and that J.P. did not need to take any further action.  Nevertheless, S.P. remains without coverage.

117.    J.P. most recently called Tennessee Heath Connection the week of July 14, and was not given any information about the status of S.P.'s application.  J.P. asked if there could be a hearing regarding S.P.'s application and the delay, and was told that they could not have a hearing because no decision had been made regarding S.P.'s application.  They were told to wait.

118.    J.P. is concerned that with each passing day, S.P. is at an increased risk of significant harm since they may not be able to pay for her future medical needs, especially given the critical emergency care S.P. has already needed to receive once.  They also fear the challenges of continuing to provide S.P. with more routine infant medical care.

*Plaintiffs K.P. and T.V.*

119.    T.V. gave birth to K.P. in late April 2014.  Before giving birth, T.V. applied for TennCare coverage on about January 24, 2014.  T.V.'s application is still outstanding.  T.V. incurred substantial bills while pregnant with K.P., and K.P. remains without coverage to this day.

120.    When T.V. applied online at the Federal Marketplace, she submitted income information and supporting documentation, including her W-2.  The website informed her she may qualify for TennCare coverage and was told that the state agency would contact her with more information about her health benefits.  Weeks passed, and T.V. received no confirmation of her coverage.

121.    A couple weeks after initially applying in January, T.V. called Tennessee Health Connection to ask about the status of her application.  She was told that since 45 days had not passed she would have to continue waiting.  After 45 days had passed, T.V. began regularly calling the Tennessee Health Connection for an update.  She has called their offices over 30 times.  When T.V. has called, she has been repeatedly told that her application would be "escalated" and she would be contacted by a Tennessee Health Connection representative.  This has never occurred.

122.    T.V. was told by Tennessee Health Connection representatives that if T.V.'s application were approved, then K.P. would automatically be enrolled into TennCare once he was born.  However, because T.V. has never received a determination on her application, K.P. also remains without coverage.

123.    T.V. had a complicated pregnancy.  Her son had a two-vessel umbilical cord, a condition that occurs in only about one percent of pregnancies and which requires additional prenatal cost and care to mitigate against life-threatening abnormalities to the newborn.  T.V. owes approximately $5,000 for the medical care she received while pregnant, as well as additional bills for the care K.P. needed in his first months of life.

124.    Before giving birth, T.V. earned approximately $1,400 per month, and she is now unemployed.  T.V. lacks the financial resources to pay her and K.P.'s medical bills.  In addition

to devastating T.V.'s finances, the lack of medical insurance has forced her to delay as much as possible the medical appointments K.P. needs. T.V. is concerned that with each passing day of no health insurance, K.P. is at an increased risk of significant harm since T.V. may not be able to pay for his future medical and vaccine needs.

125. T.V. most recently called Tennessee Heath Connection the week of July 14, and was told again that the application was not in their system. T.V. asked if she could have a hearing regarding the application and the delay, and was then told that the application had already been escalated and that she could not receive a hearing.

*Plaintiffs C.A. and D.A.*

126. C.A. was born in February 2014. Prior to his birth, C.A. was covered as an unborn child under CoverKids. His mother, D.P., received health coverage and prenatal care through CoverKids during her pregnancy with C.A. CoverKids did not provide C.A. with any medical assistance after his birth.

127. D.A. is the father of C.A., and is married to D.P. The family earns approximately $1,850 per month in income. Without CoverKids coverage, D.A. applied for TennCare a few days after C.A.'s birth, on about February 27, 2014. The family followed up with the FFM, and was told that the application was complete and that they would need to check with Tennessee Health Connection about their enrollment. When they contacted Tennessee Health Connection, they were told they have no record of the account.

128. D.A. contracted an infection in late March to early April, but tried to put off going to the hospital due to concerns about the possible medical cost. He finally went to the emergency room on Easter Sunday, April 5, and learned that he was infected with MRSA and that if he had waited a few hours longer to go to the hospital he likely would not have survived.

129.    The family is also struggling to provide for C.A. They took C.A. to a pediatrician shortly after his birth, and incurred a $1,300 bill for doing so.  They cannot afford to pay the bill. When they tried to return for C.A.'s next infant check-up, they were told they could not schedule an appointment with the doctor until they had proof of insurance.  They were desperate because C.A. needed immunizations. They were able to get some of them through the health department, but they cannot afford  a "well-child" visit to make sure that C.A. is developing as he should.

130.    The family has substantial debt from D.A.'s and C.A.'s medical care, and they are not able to pay off that debt with their limited current income.

131.    It has been over four months since the family applied for TennCare.  They recently called Tennessee Health Connection the week of July 14, and were told again that Tennessee Health Connection had not received their application.  They asked if they could have a hearing regarding the application and the delay, and were told that Tennessee Health Connection did not do those hearings.

*Plaintiff S.V.*

132.    S.V. was born in December 2013.  S.V. was covered as an unborn child under CoverKids.  His mother, M.M., received prenatal care through CoverKids.  However the CoverKids coverage ended after S.V.'s birth, and they are now without insurance.

133.     In January, M.M. applied for TennCare, but never received a response.

134.    In early May 2014, M.M. applied for TennCare again.  During that application process, the FFM representative told M.M. that it needed more information about her income. She submitted the requested income verification documents that same evening.

135.    After submitting her application and the income verification documents, M.M. did not receive a response from TennCare or the FFM.  She called the Tennessee Health Connection

30

and was told that they had not received anything regarding S.V.'s application. M.M. was also told that it had not been 45 days since she submitted her application to the FFM, so she should wait another two-and-a-half weeks.

136. M.M. has called the Tennessee Health Connection multiple times since that date. Each time, they cannot find information about the status of S.V.'s application. After M.M. expressed concern that S.V. had upcoming check-ups and needed vaccines, the representative told her to visit a community clinic. M.M.'s pediatrician, however, discouraged it, and M.M. continued to see S.V.'s regular pediatrician, even though these visits incurred costs.

137. M.M. most recently contacted the Tennessee Health Connection the week of July 14, 2014, and was told again that S.V. still does not have coverage. When M.M. requested a hearing, they told her that she could not get a hearing because she had not been denied. They suggested that she call the FFM. When she spoke with the FFM, they asked her to resubmit her income verification documents to the same address in London, Kentucky where she sent the previous set of documents. S.V. still does not have insurance coverage.

138. M.M. is particularly worried about getting health coverage for S.V. because he is a newborn and requires frequent medical check-ups. He became sick a few months ago and required medical care. M.M. owes approximately $500 for this care, an amount that she fears she will not be able to pay, and the pediatrician's office recently contacted her and asked her to come in and talk to them about setting up a payment plan on the balance she owes. M.M. has no money to pay the debit, and she fears the pediatrician will not see her child again if she does not make payments. M.M. is also worried about paying for the additional check-ups that S.V. will need in the coming months.

*Plaintiff S.G.*

139. S.G. was born in February 2014. He lives in Madison, Tennessee with his parents and four siblings. Born prematurely, S.G. needed additional medical care, which cost his family thousands of dollars. His parents survive on less than $2,000 of income per month and cannot afford to pay for S.G.'s medical needs.

140. S.G. was covered as an unborn child under CoverKids. His mother received health coverage through CoverKids until the end of June. CoverKids did not provide S.G. with any medical assistance after his birth.

141. S.G.'s parents applied for TennCare coverage for S.G. days after his birth. A month later, in March, they called the FFM to check on the application, and were referred to Tennessee Heath Connection, who said they had no record of the application. S.G.'s parents continued calling, and were told conflicting things, including that S.G.'s eligibility would be determined in from 5 to 45 days. In April or May, S.G.'s parents were advised to simply start the process over. They did so but still have not received any word about the application.

142. S.G.'s parents are concerned that with each passing day, S.G. is at an increased risk of significant harm since they may not be able to pay for his future medical needs, especially since they cannot pay the bills they have already incurred. To give but one example, because he was born prematurely, S.G. is supposed to receive monthly injections for the first year of his life to ensure that he does not contract the respiratory and airway virus, RSV. The family cannot afford these injections and has been delaying getting them.

## CLASS ACTION ALLEGATIONS

### Class Definition

143. Plaintiffs seek class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(2). This class, referred to as the "Delayed Adjudication Class," is defined as: All individuals who

have applied for TennCare on or after October 1, 2013, who have not received a final eligibility determination in a timely manner, and who have contacted the Tennessee Health Connection or its successor entity for assistance with that application.

Numerosity

144.    The precise size of the Delayed Adjudication Class is unknown by Plaintiffs but is substantial, likely in the thousands, and is spread throughout the State of Tennessee.  Joinder would be impracticable.

Common Issues of Law and Fact

145.    The named Plaintiffs raise claims based on questions of law and fact that are common to, and typical of, the putative class members.  Plaintiffs and the proposed classes must rely on TennCare and CoverKids for the provision of vital health care services, but face state policies and practices which effectively deny them such services.

146.    Questions of fact common to the Delayed Adjudication Class include:

a        Whether Defendants have in place an effective process to ensure that Class Members' applications are adjudicated with reasonable promptness; and

b        Whether Defendants have in place an effective process for Class Members to receive a fair hearing when their claim is not acted upon with reasonable promptness.

147.    Questions of law common to the Delayed Adjudication Class include:

a        Whether Defendants' failure to adjudicate the Class Members' applications with reasonable promptness, and in any event within 45 days (or 90 days if eligibility is based on a disability) violates 42 U.S.C. § 1396a(a)(8);

33

b       Whether Defendants' failure to have in place an effective process for Class Members to receive a fair hearing after their claim is not acted upon with reasonable promptness violates 42 U.S.C. § 1396a(a)(3); and

c       Whether injunctive and declaratory relief is appropriate and, if so, what the terms of such relief should be.

<u>Typicality of Claims and Defenses</u>

148.    The claims of the Plaintiffs are typical of those asserted on behalf of the class. Because the Plaintiffs and the class challenge a common set of state policies and practices, it is anticipated that Defendants will assert similar defenses as to all of the individual Plaintiffs and class members.

<u>Adequate Representation of Class</u>

149.    Plaintiffs will fairly and adequately protect the interests of the class. They are represented by attorneys from the Southern Poverty Law Center, the National Health Law Program and the Tennessee Justice Center, each of whom have experience in complex class action litigation involving health care and civil rights law. Counsel have the resources, expertise and experience to prosecute this action. Counsel know of no conflict among members of the class.

<u>Appropriateness of Declaratory and Injunctive Relief under Rule 23(b)(2)</u>

150.    Each of the Defendants has knowingly and repeatedly failed or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief with respect to the class as a whole appropriate and necessary. The nature of the violations complained of here is such that, absent systemic relief for all class members, it is impossible to adequately protect the rights of any single Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Medicaid Act, 42 U.S.C. § 1396a(a)(8)**
*On Behalf of all Plaintiffs and Delayed Adjudication Class*
*Against All Defendants*

151.    All Plaintiffs, on behalf of themselves and the Delayed Adjudication Class, re-allege and incorporate by reference the allegations set forth in Paragraphs 1 to 150, above.

152.    The Medicaid Act requires all state programs to "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).

153.    Federal regulations require state programs to implement § 1396a(a)(8) by "[f]urnish[ing] Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures," and in no event may the determination for eligibility take longer than 45 days (unless the basis for eligibility is a disability, in which case up to 90 days).  42 C.F.R. §§ 435.930(a), .912(c)(3).

154.    The Defendants are knowingly and repeatedly failing to adhere to their duty to determine Medicaid eligibility with reasonable promptness, violating Plaintiffs' and class members' rights under 42 U.S.C. § 1396a(a)(8).

155.    Plaintiffs and class members move for relief on this claim as an action seeking redress of the deprivation of federal statutory rights under the color of state law, through 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION
**Medicaid Act, 42 U.S.C. § 1396a(a)(3)**
*On Behalf of All Plaintiffs and Delayed Adjudication Class*
*Against All Defendants*

156.     All Plaintiffs, on behalf of themselves and the Delayed Adjudication Class, re-allege and incorporate by reference the allegations set forth in Paragraphs 1 to 150, above.

157.     The Medicaid Act requires all state programs to "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

158.     The Defendants are knowingly and repeatedly failing to adhere to their duty to provide individuals with the opportunity for a hearing as required by the Medicaid Act.

159.     Defendants' failure to provide for any appeal or hearing when determinations on TennCare applications are not made reasonably promptly, or when applications are simply impossible to complete, violates the Plaintiffs' and class members' right to a fair hearing to review their denial of eligibility and receipt of medical assistance.

160.     Plaintiffs and class members move for relief on this claim as an action seeking redress of the deprivation of federal statutory rights under the color of state law, through 42 U.S.C. § 1983.

### THIRD CAUSE OF ACTION
### Due Process Clause
*On Behalf of All Plaintiffs and Delayed Adjudication Class*
*Against All Defendants*

161.     All Named Plaintiffs, on behalf of themselves and the Delayed Adjudication Class, re-allege and incorporate by reference the allegations set forth in Paragraphs 1 to 150, above.

162.     Defendants' policy and practice of failing or refusing to provide a fair hearing when Defendants have exceeded the time permitted by law for a determination of eligibility for

36

Medicaid violates Plaintiffs' and class members' rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

163.    Plaintiffs and class members move for relief on this claim as an action seeking redress of the deprivation of their constitutional rights under the color of state law, through 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Assume jurisdiction over this action;

B.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) with respect to the proposed classes;

C.    Enter a declaratory judgment, in accordance with 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring that Defendants have violated and continue to violate Plaintiffs' and Plaintiff class members' rights under federal law in:

   i.    failing their nondelegable duty to process all applications for TennCare within the timeframes required by federal law; and

   ii.    failing their nondelegable duty to provide an opportunity for a fair hearing before the Department of Finance and Administration to any individual whose claim for medical assistance under TennCare is not acted upon with reasonable promptness as required by federal law;

D.    Preliminarily and permanently enjoin Defendants from:

   i.    refusing to process TennCare applications, and provide TennCare benefits, within the timeframes required by the federal Medicaid Act and its implementing regulations; and

37

    ii.   refusing to provide an opportunity for a fair hearing before the Department of Finance and Administration to any individual whose claim for medical assistance under TennCare is not acted upon with reasonable promptness as required by federal law;

E.   Order Defendants to take steps to remedy these violations, including:

    i.   promptly adjudicating the TennCare applications of Delayed Adjudication Class Members;

F.   Award reasonable attorneys' fees and costs as provided by 42 U.S.C. § 1988; and

G.   Order such other, further or additional relief as the Court deems equitable, just and proper.


DATED this twenty-third day of July, 2014.    Respectfully submitted,

     /s/ Christopher E. Coleman
Christopher E. Coleman
*On Behalf of Counsel for Plaintiffs*

Michele Johnson TN BPR 16756
Gordon Bonnyman, Jr. TN BPR 2419
Christopher E. Coleman  TN BPR 24950
TENNESSEE JUSTICE CENTER
301 Charlotte Avenue
Nashville, Tennessee 37201
Phone: (615) 255-0331
FAX: (615) 255-0354

Sara Zampierin*
Samuel Brooke*
Jay Singh*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama  36104
Telephone:  (334) 956-8200
Fax:  (334) 956-8481
sara.zampierin@splcenter.org
samuel.brooke@splcenter.org

38

jay.singh@splcenter.org

Jane Perkins*
Elizabeth Edwards*
NATIONAL HEALTH LAW PROGRAM
101 E. Weaver St., Suite G-7
Carrboro, NC  27510
Telephone: (919) 968-6308
Fax: (919) 968-8855
perkins@healthlaw.org
edwards@healthlaw.org

**Attorneys for Plaintiffs**

*\* Application for Pro Hac Vice Admission
Forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed with the court (in paper form and via cd-rom).  I further certify that true and correct copy of the foregoing will be served on the office of the Attorney General and Reporter, along with the summons, pursuant to Fed. R. Civ. P. 4(e)(1) and Tenn. R. Civ. P. 4.04(6):

Office of the Attorney General and Reporter
425 5th Ave N #2
Nashville, TN 37243

Dated:  July 23, 2014

<u>/s/ Sara Zampierin</u>